DEFIANCE FRUIT COMPANY

*v.*

THOMAS C. FOX

THOMAS C. FOX

*v.*

DEFIANCE FRUIT COMPANY et al.

[Submitted July 14th, 1909. Decided July 16th, 1909.]

1. A riparian proprietor is entitled to have the stream discharge its waters in its natural course and in its natural way, except to the extent to which a lower riparian proprietor having constructed a dam across the channel has acquired a prescriptive right to interrupt the natural flow.

2. Evidence reviewed, and *held* to require a finding that defendant had obtained a prescriptive right to raise the water of a stream by means of a dam only to a height three inches below the level claimed by him.

On bill and cross-bill.

*Mr. Henry S. Alvord,* for the complainant.

*Mr. George J. Bergen* and *Messrs. Carrow & Kraft,* for the defendants.

LEAMING, V. C.

On October 26th, 1905, a bill was filed by Defiance Fruit Company (hereinafter referred to for convenience as "the company") for an injunction to restrain Thomas C. Fox (hereinafter referred to as "Fox") from raising the water in his mill pond at Willow Grove, New Jersey, to a height which was alleged to injure a cranberry bog on the land of the company situate above

the mill pond on either side of a natural stream which flows into the pond. Fox answered asserting that he and his predecessors in title had maintained the water in the pond at the height complained of for over twenty years prior to the date of the filing of the bill. When the cause came on for final hearing, it was ascertained that the issues involved were purely legal rights, the existence of which were in substantial dispute, and this court, in consequence, refused to entertain jurisdiction until the legal rights in dispute were determined at law; the bill was, however, retained, pending a proposed action at law, because of the absence of any denial of equity jurisdiction on the part of defendant. Accordingly the company brought an action of trespass against Fox, and after trial a verdict was rendered in favor of defendant. Thereafter the company brought another similar action at law against Fox, and before the trial of that action Fox, by leave of this court, filed, in the original equity suit, a cross-bill in the nature of an original bill in which the history of the litigation up to that time was recited and the suits at law were alleged to be vexatious, and the company and others in interest were made parties to the end that this court should make a decree determining the level to which the water in the mill pond could be lawfully maintained. The several defendants to the cross-bill answered and joined in the prayer of the cross-bill that this court determine the level at which the waters of the pond could be lawfully held by the mill owner.

The mill pond is formed by a dam which interrupts the flow of a natural stream known as "Scotland Branch," and the cranberry bog of the company is on either side of that stream a mile or more above the dam. The dam has been maintained by Fox and his predecessors in title for upwards of fifty years, and the two mills now owned and operated by Fox have during that time been supplied with power from the waters of the pond.

The testimony adduced at the hearing, and especially when considered in connection with a view of the premises made by me at the request of the respective counsel, leaves no doubt in my mind but that, with the water in the pond maintained at the height at which Fox claims the right to maintain it, the natural and beneficial flow of the stream passing through the property

of the company is interrupted and interfered with by the back water occasioned by the dam in a manner and degree which materially injures the property of the company. This fact is so manifest that I think it unnecessary to enter upon a discussion of the evidence further than to state that the level at which Fox claims the right to maintain the water in the pond is above the level of the bed of the stream passing through the company's bog; when this level is raised to the extent necessary to enable the stream to discharge the waters which flow down it under normal conditions—about six inches—the water overflows the banks of the stream at the lower or southerly portion of the bog and also prevents proper drainage of other parts of the bog. In other words, the water of the pond, when maintained at the level at which Fox claims the right, operates to interrupt the natural flow of the stream through the company's land and to back water on its bog.

It is entirely clear that the company is entitled to have this stream discharge its waters in its natural course and in its natural way except to the extent to which Fox has established a prescriptive right to interrupt the natural flow. As the right of Fox to thus interfere with the natural and beneficial flow of the stream through the company's property is claimed by him to exist by prescription, and as both parties have joined in the prayer for this court to determine the level at which Fox may lawfully maintain the waters of his pond, the difficult task has been undertaken to ascertain the conditions which have existed during the twenty years preceding the commencement of this suit. The inquiry has necessitated the examination of a great number of witnesses touching early conditions, and, as may well have been anticipated, the testimony is in radical conflict in many respects. At the conclusion of the hearing the respective counsel joined in a request that I should view the premises and should also make independent investigations of my own, assisted by an engineer of my own choice, and a written stipulation of that nature has been filed. This unusual course has been adopted by reason of the extreme difficulty in ascertaining the exact truth touching many things concerning which the testimony was in conflict or was incomplete which could be accurately ascertained

by a view and measurements or demonstrations in my presence. I have accordingly visited the premises twice in the presence of respective counsel and have been assisted by a millwright of my selection employed by the respective counsel for that purpose. The investigations which I have made on the premises in dispute in the presence of respective counsel, have been of great service to me in determining the force to be properly given to much of the testimony, and while I somewhat doubt the propriety of pursuing this course in ordinary cases, I am fully convinced that it is the best course which could have been adopted in this case to insure the highest practicable degree of accuracy of conclusions.

The level at which Fox claims the prescriptive right to maintain the waters of the mill pond is marked on a horizontal string-piece which forms the top or cap of the wing of a bridge at the easterly end of the dam. This string-piece is not quite level and the water of the pond submerges the northerly end of the string-piece first. When the northerly half of the string-piece is submerged and the southerly half of the upper surface of the string-piece is still exposed, the water is at the level at which Fox claims it has been maintained for a working head during the twenty years next preceding the commencement of this suit. In the upper surface of the string-piece referred to, about midway between its ends, a nail is driven to designate the point at which the water of the pond will stand when at the working head claimed by Fox. A number of witnesses have testified touching this string-piece, and assert that it has been where it now is for more than twenty years, and that the level of the centre of the upper surface of that timber represents the level at which the pond has been held for working purposes during all of that time, whenever sufficient water could be held in the pond to maintain that level. Other witnesses assert to the contrary, and some testimony indicates that this string-piece was placed where it now is less than twenty years ago. It is urged that the abutment of the bridge with which the end of this string-piece connects was washed away within twenty years, and that any string-piece there at that time was necessarily removed or changed. A number of other witnesses fix the level of the pond during the past twenty years by

the statement that the pond was always maintained, when suffi-
cient water could be had, at about the level of what is known as
the Dare lot. The Dare lot is the sideyard of a house known as
the Dare house. This house stands near the southeast corner of
the mill pond; the land between the pond and the house was
the sideyard of the Dare house. The testimony of a number of
witnesses is to the effect that the water has always been main-
tained at about the level of that sideyard; that the aim was to
keep the pond as full as it could be without overflowing the
Dare lot between the house and pond; that in freshets the lot
would sometimes be overflown before the flood gates could
be raised. The part of the Dare lot referred to is now surfaced
with gravel which has been placed there within a few years, but
the amount of gravel placed there is in dispute. It is urged in
behalf of Fox that but a few loads of gravel have been placed
on the Dare lot. The surface of this gravel is now about the
level of the water in the pond when the water is at the level of
the nail referred to. Other witnesses have pointed out that back
of the barn in the rear of the Dare house a "frog-pond" or "scow-
hole" existed in the early days by reason of water flowing into
it from the pond. With the water in the pond two inches below
the nail I found the water running from the pond into this de-
pression, at the time of one of my visits to the pond. A number
of other witnesses, with various objects to assist their memory,
were quite positive that for twenty years past and more the water
of the pond has been maintained as high as it now is when at
the level of the nail referred to. Other witnesses have been
equally positive to the contrary. Along the course of the stream
between the pond and the company's property above, dead cedar
trees, standing with their roots and part of their trunks sub-
merged with water, are pointed out as indicating that the trees
could not have grown in water of such depth. On many of
these trees the bark remains intact, and the testimony is that
the bark of a dead cedar tree will not remain longer than ten
or fifteen years. There are, however, similar dead cedar trees
without bark. Photographs of the vegetation along the entire
course of this stream have been introduced in evidence. It has
also been shown in behalf of the company that the bridge,

already referred to, which passes over a canal at the easterly extremity of the dam, has been twice elevated. This canal leads to one of the mills of Fox—the saw mill—and supplies the water power for that mill. A road overseer testified that in 1896 he raised the bridge six inches by adding six inches of stone to the top of the stone abutments; on top of the stone which he added he placed a two-inch plank and the bridge was made to rest on the two-inch plank. That since then the bridge appears to have been raised six inches more by placing a six-inch plank on the two-inch plank. An examination of the bridge verifies the testimony of Mr. Albertson to the effect that, with the water in the pond at the level of the nail, the water at this time is at the level of the point of contact between the stone and the two-inch plank referred to. It follows that if the road overseer added six inches in height to the stone abutments and the water was prior to that time maintained at the level of the nail, it was maintained six inches above the stone work of the abutments. Testimony also exists to the effect that the dam has been raised during the past twenty years; but this is in turn denied. With the water at the level of the nail, it is about as near the top of the dam as it can be safely maintained; at worn places the water extends partly in the roadway which crosses the dam. Testimony also exists to the effect that the water did not formerly cause trouble at the bog of the company, but that it now operates to severely injure the bog.

As already stated, two mills are supplied with power by the waters of the pond. One is now operated as a saw mill and has been referred to. The other is a grist mill and receives its water through a flume or fore-bay passing through the dam some fifty yards or more westerly of the canal referred to. Formerly, each of these mills was equipped with an old-fashioned "undershot" or "low-breast" wheel. In 1889, less than twenty years before the commencement of this suit, these wheels were removed and turbine wheels were installed in their stead. The millwright who installed the turbine wheels testified that the working-head of the old wheels was four and one-half feet, and that he placed the new wheels for use with the same working-head. The "working-head" referred to represents the vertical distance between

the level of the water in the tailrace, with the mill running, and the level of the water in the pond.  An accurate measurement of the working-head of the grist mill discloses that with the water in the pond at the level of the nail referred to, the working-head is four feet ten and eight-tenths inches, or four and eight-tenths inches more than the working-head of the old wheels, if the mill-wright, who renewed the old wheels, was correct in his statement of the old working-head.  Other witnesses also testified that four and one-half feet was the working-head of the old wheels.  There can be no doubt of the accuracy of the measurements of the present working-head with the pond at the nail level.  The measurement was twice taken—on different days—in my presence and in the presence of counsel, with both mills running at full capacity in order that the greatest possible amount of back water in the tailrace could accumulate.  I do not regard this excess over four and one-half feet of working-head as conclusive evidence that the water, when maintained at the level of the nail referred to, is four and eight-tenths inches higher than it was used before the turbine wheels were installed, for the witnesses of Mr. Fox, who testified to the former working-head of four and one-half feet may not have been entirely accurate, but when taken in connection with other testimony and with features yet to be referred to, it is strongly indicative of a former level of the pond below that now claimed.

As already stated, a number of witnesses, who testified in behalf of Fox, stated that for over twenty years the pond has been maintained as high as it could be without overflowing the yard between the pond and the Dare house.  To ascertain to what extent the Dare lot has been raised by the gravel referred to, three test holes were dug through the gravel at distant points into the soil below.  The gravel was coarse, yellow gravel, packed and hardened, and the under surface of the gravel was almost as plainly marked as its upper surface.  At the lines of demarcation, between the gravel and the soil below it, pins were inserted and levels were then run from the nail in the string-piece, which marks the level of the pond claimed by Fox as its ancient level to the three pins marking the bottom side of the gravel.  The levels thus run, with a transit in my presence and in the presence

of counsel, disclosed that the bottom of the gravel at the first test hole was two and twenty-eight hundredths inches below the level of the pond; at the second test hole, three and forty-eight hundredths inches below the level of the pond; at the third test hole, three and ninety-six hundredths inches below the level of the pond. In other words, if the gravel should be removed from the Dare lot the water of the pond would, when maintained at the height claimed as its ancient height, be about three inches deep on the Dare lot between the pond and the Dare house. As this gravel was admittedly placed on the Dare lot in recent years, it is manifest that the pond could not have been maintained at its present level twenty years ago without flooding the Dare lot, if the bottom of this gravel can be accepted as the former surface of that lot, and the testimony is, as already stated, that the Dare lot has not been flooded, except in freshets occurring before the flood gates in the dam could be raised to lower the water.

Twenty years ago there stood at the edge of the mill pond in question an ice house in which ice from the pond was stored. The ice house is no longer there, but the "lifts" with which the ice was hoisted from the pond are still, in part, in place. The cakes of ice were floated onto these lifts and hoisted to a point at which they were deposited in the main ice house. The sill on which the lifts rested when down is still in place. The lifts were produced and offered in evidence as exhibits. As the testimony of witnesses touching measurements of the depth of water over these lifts differed, remeasurements were made in my presence. The depth of water above the upper surface of the sill, on which the lifts rested when down, was found to be twenty-six inches when the water in the pond was at the level of the string-piece nail. The lifts, two in number, are constructed with a bottom framework on which the cakes of ice rest; lateral uprights are secured to the bottom framework; these lateral uprights are connected by a horizontal cross-piece under which the cakes of ice must pass when floated on the lifts. The bottom frameworks of the lifts are one and three-quarter inches in thickness; the distance in the clear from the bottom framework to the cross-piece, is twenty and one-half inches. It will thus be seen that with

the lifts resting on the sill above referred to, ready to receive cakes of ice, the lower surface of the cross-pieces of the lifts, under which the floating cakes of ice would need to pass, would be three and three-quarter inches below the surface of the water of the pond if the pond was at the level contended for by Fox. It may have been practicable to operate these lifts with their bottom framework raised several inches above the sill to receive cakes of ice, and thus enable the floating cakes of ice to pass under the horizontal cross-piece, but as the lifts were operated by horse-power, I think otherwise. I think that the mechanism above described may be reasonably said to indicate that it was intended to conveniently receive ice from a pond in which the water was at least three inches below the height now asserted by Fox as the ancient height.

It is now necessary to refer to the construction of the two penn stocks. When the water of the pond is at the nail level referred to, the water in the penn stock of the saw mill is within a fraction of an inch of its top; where uneven places exist in the upper surface of the top sheathing planks of the penn stock the water overflows; no higher head of water could be utilized. At the grist mill the penn stock appears to have been originally constructed with a framework of eight by eight upright timbers resting on transverse sills of the same dimensions. At the rear end of the penn stock an eight by eight timber connects the upper ends of the two rear corner upright timbers. Inside of and against these upright timbers is the horizontal sheathing of the penn stock, the lateral sheathing extending to within one inch of the level of the top of the rear eight by eight horizontal frame or cap timber above referred to. On top of this rear eight by eight cap timber is a four by six timber. This timber operates to raise the height of the rear end of the penn stock four inches, and does not appear to have performed any office in the original construction. To raise the sides of the penn stock even with the top surface of the four by six timber a two by five sheating plank is added. The effect of the four by six end timber and the two by five sheathing plank is to enable the penn stock to hold five inches more water than it could hold before these additions were made. It cannot be stated with posi-

tiveness that these additions were made since the penn stock was first constructed, but such is the appearance. With the water in the pond at the level of the nail referred to, the water in this penn stock of the grist mill is at the line of contact of the horizontal eight by eight and four by six, and is five feet seven and two-tenths inches above the bottom of the penn stock: This would be one inch above the top of the sides of the penn stock if the upper two by five sheathing plank were removed. It does not seem reasonable to suppose that these two open penn stocks would have been constructed with no margin of height above the level at which the water in the mill pond was intended to be maintained; the natural and reasonable inference is that the level of the water in the pond which these penn stocks were constructed to serve was lower than the level of the nail referred to which marks the working-head now claimed by Fox.

Another feature of the construction of the grist mill penn stock should be referred to. On the easterly side of this penn stock there is a horizontal framework timber extending from the second to the fourth upright eight by eight timbers referred to, and mortised into these two uprights. The intermediate eight by eight upright is mortised into the bottom of this horizontal framework timber. This horizontal framework timber is old and its upper surface decayed; the upper surface is eight inches below the level of the water in the pond when at the level of the nail referred to. While this timber may have formed a part of the upper framework of the old penn stock which has been superseded by the present one, I think that fact too uncertain to warrant any conclusion based on that assumption.

The testimony disclosed that the present turbine wheels which were, as heretofore stated, installed less than twenty years ago to take the place of horizontal undershot or low-breast wheels, economizes water to the extent of about twenty to twenty-five per cent. That is, the same power is obtained by the use of less water. As the testimony shows that it was found difficult to store enough water to hold the pond at or near the full head with the old wheels in use, it follows that with the new wheels performing the same duty as the old, the tendency would be to increase the level of the water maintained in the pond.

After a careful consideration of all the evidence, I am fully convinced that the level of the water in the pond, as it is now sought to be maintained, is higher than it was formerly maintained or used, and that the water has not been maintained or used at the present level for a period twenty years next prior to the commencement of this suit. I reached this conclusion from the evidence before I viewed the premises or made the independent investigations which have been referred to. The view which I made of the premises has fully confirmed that conclusion. But without a view of the premises I doubt whether I could have reached a satisfactory conclusion as to the amount which the water has been raised during the twenty years referred to. Using the information gained by a view of the premises in connection with the testimony taken at the hearing, I am now fully convinced that twenty years next before the commencement of this suit, the water in the pond was not and could not be maintained or used at a higher level than three inches below the level now claimed by Fox, which latter level is marked by the nail in the centre of the upper surface of the string-piece or cap wharf log at the southeast corner of the pond. This distance of three inches below the nail referred to will, in my judgment, represent with reasonable accuracy the level at which Fox has acquired a prescriptive right to maintain the water in the pond. There are so many features of the case which lead me to these conclusions that it seems impossible to escape them or to doubt their accuracy. The testimony touching the raising of the dam; the testimony touching the raising of the bridge to the level of the road on the dam; the construction of the old ice house lifts and the mechanism for their operation; the condition of the vegetation along the stream between the pond and the company's property above it; the height at which the back water from the dam causes the water to rise on the company's property; the level of the Dare lot below the gravel covering; the present working-head of the mills; the height of the penn stocks of the mills as at present constructed; the conservation of water by the present turbine wheels, all indicate an increased head of water, and many of the features named indicate an increase of head of about and not less than three inches.

I will advise a decree fixing a point three inches below the level of the upper surface of the string-piece already described at the point where its surface is intersected by the nail referred to as the height at which the water in the pond may be lawfully maintained. Levels have been run from this nail to an elevation bench mark at Newfield, established by the Pennsylvania Railroad Company, and that bench mark has in turn been checked with elevation bench marks established by the United States government. I think it important that the level mark designated in the decree should be permanently fixed by checks of the nature referred to or by some other satisfactory method. If the respective counsel will agree upon the method of designation of the level to be specified in the decree, I will advise a decree so framed.